Would you like me to record with you? Sure, absolutely. May it please the Court, my name is Richard Kiwana, and I am appearing on behalf of Appellant Arthur Jeremiah. Mr. Kiwana. We respectfully submit, Your Honors, that the record does not support the district court's revocation of supervised release from Mr. Jeremiah. Now, at the outset, the primary reason for the revocation of appellant supervised release was because of his alleged willful failure to make restitution payments. As stated in our brief, willful is defined as an act done voluntarily and intentionally with the purpose of violating a known legal duty. The record demonstrates, however, that Mr. Jeremiah did not willfully fail to make restitution payments. Weren't the restitution payments were to be deducted from his paycheck? That's correct, Your Honor. And was he completely accurate with the probation office about the onset of employment? Your Honor is referring to his September pay stub and his working in September. I think the record is unclear, but basically the probation, because Mr. Jeremiah did not testify. However, the probation officer did state that Mr. Jeremiah told him that he knew that he had worked, but he had given him wrong information. And that's all we have on the record. However, I Why isn't that sufficient? Excuse me, Your Honor? Why is that not sufficient? Well, Your Honor, I think the entire record demonstrates that the probation officer's recantation of what occurred is suspect. There are so many times in which he either gave half-truths or essentially misled the court as to what occurred. And the most striking indication of that is his statement, not only in his statement of facts that he had consulted with the financial litigation section of the attorney general's office, and they told him that Mr. Jeremiah had not made a restitution payment, when, in fact, in his report, Mr. Jeremiah had made a restitution payment of $87.29 and had attached it to one of his monthly reports. Not only that, in his testimony at the hearing, the probation officer apparently attempted to cover himself, but failed to do so when he testified that, first of all, he had consulted with the financial litigation section, and then later on said, well, I just examined the information that he gave to me. So, Your Honor, we would submit that those are indications that raise serious questions about all of the facts that are alleged in the statement of facts and in the allegations. Counsel, we're reviewing Judge Gilmour's findings of facts by what standard of review? Clear error? Well, Your Honor, it's a preponderance of the evidence. Preponderance of the evidence? As to whether or not the case was proved. In any event, it's somewhat deferential. That's correct, Your Honor. So what is it that you're asking us to do at this point? We're not de novo. We're not making an original determination on the facts. What is it in terms of Judge Gilmour's findings that we would have to find before we could reverse? Well, Your Honor, we would submit that the record demonstrates that the burden of proof was not carried by the government in terms of saying the preponderance of the evidence justified the revocation of supervised release. All right. And we would submit that because of all of the reasons that we've cited in terms of whether or not Mr. Jeremiah willfully failed to attempt to comply with revocation with the requirements that were laid down by the probation office. Now, for example, the government might make the point that, well, Mr. Jeremiah voluntarily agreed to some of the things, the voluntary payroll deductions, et cetera. But reality, Your Honors, I'm sure, as the Court knows, is that when the probation officer speaks, the supervised release, he listens. I mean, it's not as if, you know, I'm going to voluntarily do anything. I'm going to do what the probation officer tells me to do. So I think that's the reality of the situation. So what Mr. Jeremiah did was basically whatever the probation officer told him to do. And he basically said, okay, you want me to sign this form? I'll sign the form, the form which had been already prepared by the U.S. Attorney's Office, given to the probation office. And when Mr. Jeremiah came in, he signed on the dotted line just as directed. And he followed everything that the probation officer asked him to do. In other words, when the probation officer basically told him you have to pay $275 more, which again is another issue, I think it raises the issue of whether or not the probation office overstepped its bounds. And in fact, whether the district court could assign to the probation office how much and in what manner restitution payments must be made. As pointed out in the Betz case, although it wasn't exactly the same facts in Betz, we had an even more egregious situation where there was a willful attempt by the defendant to avoid his restitution payments. In this case, we have here evidence which indicates that Mr. Jeremiah attempted in good faith to make his restitution payments. And there were numerous instances where he was led astray by the probation office. And that's another indication about whether or not the testimony and record presented by the probation officer should be relied upon. What evidence was there before Judge Gilmour that the probation officer misled your client? Well, Your Honor, if you take a look at the exhibits that we presented, there are at least three different instances where the probation officer called Mr. Jeremiah into his office and told him this is how much you owe, this is how much you owe, and this is how much you have to pay. And of course, the last statement was after Mr. Jeremiah had suffered industrial injury. But in each of these instructions to Mr. Jeremiah, the figures were different. For example, another indication is the fact that there was a meeting in November of 2006 in which the probation officer, in his submission as part of discovery, provided a behavioral contract in which he said Mr. Jeremiah refused to do any of it, and he signed at the bottom refused, that is Mr. Jeremiah refused to do it. However, Mr. Jeremiah had received that same document from the probation officer which is addressed as one of the exhibits that we have where the probation officer actually went down the list and said okay, this condition is okay, this condition is okay, and did it in red pen. So that an initial, so that there was really no doubt about what was being done. So Can I just, before the time expires, ask you about his incarceration status and the timing? Well, Your Honor, that's one of the problems of the case because Mr. Jeremiah recently, as I understand it, was released into a halfway house and then subsequently is basically homeless right now and is living in a shelter. Okay. So he's basically served this sentence. He served the time of 12 months, which is. And he's on supervised, the 24-month supervised release right now. Plus the 24 months of supervised release. And I might make one other point about that, and I would like to. And are there any collateral consequences to the sentence he received as opposed to the one, let's assume that he was eligible factually for a sentence, and he got the 12 months, I think the guideline was 3 to 9. Three to nine months. Are there any consequences as a result of his having gotten the 12 months beyond the obvious unfortunate consequence to him that he's been in prison, but now he's out. So is there anything else that would flow from that? Well, I don't mean to be facetious, but he now has a more difficult probation officer to deal with. But I don't believe. I'm just trying to understand where, on the appeal, whether some of these things might be moot. Well, perhaps that might be moot. But I think that it's not moot that the injustice that we allege that Mr. Jeremiah has suffered should not go unrecognized. And furthermore, perhaps the Court should. Well, what is the relief that can be given at this stage? Well, Your Honor, we would submit that perhaps the Court should reverse, vacate the judgment and send the case back and perhaps ask the district court to consider terminating Mr. Jeremiah's supervised release. I'm not sure whether the Court can do it, but certainly for every wrong, there should be a remedy. And I think there was a wrong that was done here. Even, just to make sure I understand, even as to his remaining claims, he still has a claim about the drug testing. That's correct, Your Honor. That was imposed up to eight times a month. That's right. On his supervised release situation. And the permission to search and things of that nature. That's correct, Your Honor. Thank you, counsel. Your time has expired. Thank you, Your Honor. We'll hear from the government. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. Larry Tong, Assistant United States Attorney, appearing for the government. Judge McKeown, if I can take your question first. That's a question, frankly, I had not thought of until you just asked. He has fully served his 12 months that was imposed on this particular revocation of release. By now – well, I do not think the appeal has moved just because he served his time. He is presently on another term of supervision. He is subject to two of the particular conditions that – Okay. But let's – but there's a lot of issues here. There are. If, for example, we determined that there wasn't a factual basis for, you know, the revocation in the first place, that would be a live issue because it could affect his supervised release. Absolutely. Okay. So that's – that issue could still be live. But even though – even – let's assume that we determined that there were a factual basis at the time. Is the failure to articulate under Cardi, Zavala, Gall, et cetera, and the reasonableness of the sentence imposed simply with respect to the imprisonment portion, would those be moved? I don't think they would, Your Honor. If I can analogize, right now, as the Court well knows, the DOJ is receiving a lot of motions for a reduction of sentence as a result of the amendments to the crack cocaine guidelines. And the Bureau of Prisons has taken the position, and we have advocated in those particular cases, that in some circumstances a reduction might result in the defendant having served more time than is ultimately imposed on resentencing. And I believe what the Bureau of Prisons does in those instances is it gives the excess time, puts it in a bank as a credit towards the defendant should he be revoked on any future supervision. Okay. So I think by analogy – So if we determine the sentence is unreasonable, then he might get some bank time. Well, that presupposes that you would then remand and that the Court would impose some other sentence. I don't know – I don't believe that the Court could determine or should determine from this record that it's substantively unreasonable. I can understand that in light of Carty and Zavala, which came down after this particular sentencing, the Court might be troubled by the district court's explication of the reasons, although I do think there is support in the record for what the Court has done. I don't know if I've answered Your Honor's question. We do think, and I would submit, that it is a deferential review in answer to Judge O'Scanlon, I believe's original question. The court is required, or the district court was required, to find any alleged violation by a preponderance of the evidence. Its ultimate determination to revoke is subject to an abuse of discretion review. The underlying facts are subject to a clear error review. So it is a deferential review, and on that standard of review or any other, I submit that there's ample evidence to support the revocation. What's the factual basis for the drug testing condition? Well, there is no factual basis that was explicitly stated by the judge. The legal basis is that the statute mandates the imposition of a drug testing condition unless the court in its discretion finds that it is unnecessary. And there are cases that we have cited to the Court, coming from this circuit, that suggest that it is not an abuse of discretion to impose drug testing, even where a particular defendant has no history of substance abuse and the underlying crime of conviction is not drug-related. That would be the Jackson case, 189, Fed Third, 820. So in this instance, under Jackson, the imposition of the condition was perfectly appropriate. It had been not. What about eight times a month for a guy who's not a drug crime and who's been clean on the drug tests that they did administer? First off, the same condition was reviewed by this very court in the last Jeremiah appeal and was affirmed, albeit on plain error review. We have a question. And now we've got a few more here. Well, we don't have a few more drug tests, Your Honor. We still have the same eight maximum, which was set. Is that law of the case? As much as I would like to say yes, I have to say no. And I think it's because it's a different standard of review. I think that it is still the right decision on this appeal as well, because even under a less deferential standard of review under the Jackson case cited, I think the Court was well within its discretion to impose the condition. The only evidence cited to the Court in this particular case that would militate against the imposition of the condition is that the defendant had two negative drug tests. But as I argued on the last appeal, essentially, the did the probation department has the discretion to reduce or modify the frequency of the drug testing to account for the progress of the defendant and his rehabilitation. If he didn't have any positive drug tests, they could well have the or they do have the authority to test him less than eight times a month. The eight times a month is just the outer limit which was imposed in light of the circuit's, Stephen's opinion a couple of years ago. What does the record tell us in terms of the actual testing? The only thing in the record is that there have been two tests and they've both been negative. Over what period? I believe it was over the entire period on which he was supervised, so that would be eight months or more. There was one in 2006. I believe so, yes, Your Honor. I could check that, Your Honor. I could be a tad mistaken simply because this is his second term of supervision. Well, can we derive from that evidence that the actual testing was less than eight times a year, eight times a month? Definitely, Your Honor, because the limit would be eight a month, and at a minimum it was an eight-month period we're talking when he was on supervision with two tests. All right. Could you go to the point you raised earlier, and that is the specificity of the reasons for the departure? Obviously, the Court didn't have the benefit of the fairly clean language now that says you need to articulate this, and I'm a little hard-pressed to see how you could get there from just looking at the current record. Well, I'll take my shot, Your Honor. I agree that Judge Gilmour did not have the benefit of Cardi-Zavala and the bulleted list of items that any sentencing judge should go through, which coincidentally helps us as AUSAs in the district court. But be that as it may, this is an unusual case insofar as the record spans proceedings over a period of years. We have the underlying criminal conviction, which involved a bank fraud, a situation where the defendant essentially misused a expired merchant account to make fraudulent charges using the credit card numbers of his prior customers and then crediting them to his account where he could then use the money. The defendant then also testified at trial falsely and was assessed two points for obstruction of justice. The Court in the original proceeding found that his crime was one of dishonesty and that he had a problem with handling other people's money. The Court then sentenced him to a jail term, which he served, gave him a TSR, a term of supervised release, with conditions that were designed to assure that he pay restitution and that he be truthful in his financial dealings. The Court then, having explicated its reasons in the first sentencing, had an opportunity to see him when he was revoked the first time. And the violations for which he was revoked on the first time were pretty much the same as the violations that bring us to this Court today. Failure to pay restitution, failure to be honest with the probation officer with regard to his earnings and his ability to pay, failure to submit truthful monthly supervision reports, and failure to pay restitution when specifically directed. The Court at that time imposed a jail term of three months, gave him another 57 months of supervision, lectured him, admonished him on his obligations, and here we are again. And you can see that the record is flavored with that history, where essentially we can always imagine why the judge might have imposed a term, but I guess that's the beauty of asking them to tell us why. So instead of kind of trying to put ourselves in the shoes and saying, well, does that make sense, which it could well make sense, should the – is that a judgment that the appellate court ought to be making on this record? If I can answer quickly, Your Honor, I see my time is rapidly unwinding. I submit it's on a plain-error review, because the defendant was told what her intended sentence was going to be. The judge then said, do either party have any objections? The sole objections raised by the defendant at that point were to the drug testing and search conditions, not to the sentence and not to the failure to give reasons for the sentence. So on plain-error review, I think it is the Court's province to say that you can look at all of the evidence, you can conclude from the evidence that there was no plain error, you can conclude that in essence her reference to the defendant's continued obfuscation, the desire not to burden probation with the full term of a new supervised  under 3583, and essentially that's why she went above the guideline range. Thank you, counsel. Your time has expired. Thank you, Your Honor. The case just argued will be submitted for decision.
judges: O'scannlain, Hawkins, McKeown